Your Honors, and may it please the Court, the DVA's interpretation of clear and unmistakable error to exclude intervening interpretations of statutes and regulations based on their plain meaning cannot be salvaged. Sir, I'm sorry, could you first address standing? I'm concerned about standing here for your ability to come forward with this challenge, so please discuss that. Your Honor, Mr. Haisley is a veteran with a current claim before the agency that he believes contains an error and that it's subject to the CUE rule under the clear holding of DAV against Gober that establishes standing. What's the current status of that claim? As I understand it, it's received an initial decision which has some level of benefit but some denial of the degree of benefit, and so is Mr. Haisley now appealing that to the BVA? It's correct that, well, what we know, Your Honor, is that Mr. Haisley received a benefits decision that he believes is erroneous. We do not represent Mr. Haisley before the Board, and we don't know exactly what he believes is erroneous about his claim. We haven't looked at the medical records or into the briefing or anything like that. All we know— But as far as I know, he has not filed a CUE claim because he doesn't even have finality on the initial claim. Is that fair to say? That's correct. Okay. So what is the theory of harm as it relates to this particular regulation that bars the use of CUE for a changed judicial interpretation when we don't even have a finality on that initial claim? Your Honor, finality was not a requirement in the standing holding of Gober. Gober said that standing was established because the veterans were, quote, personally affected by the CUE rules and, quote, have valid concerns about the effect of the rules and their ability to challenge a Board decision on the basis of CUE. Okay. What else? Well, let's now get back to my question. Put Gober to the side. What is the storyline here for Mr. Haisley's theory for why the existence of this regulation is harming him and harming his claim for a higher rating? Mr. Haisley is harmed because if his decision becomes final, a avenue of review that should be open to him per Congress's clear meaning has been foreclosed. And again, I know you said put Gober to the side, but I don't believe it can be put to the side. I'm sorry. I'm sorry. What is the changed judicial interpretation theory that Mr. Haisley would then attempt to employ in a CUE claim should, in fact, his initial claim go final and him not being able to get as full of a benefit award as he would like? Again, Your Honor, we don't represent Mr. Haisley before the Board, and we don't know the particulars of what he believes is incorrect about his decision. We haven't looked into the medical records or the briefing. All we know is that he believes sincerely and as attested to in our evidentiary submissions that there is error in the decision. The CUE rule forecloses a congressionally established avenue of review for that CUE. And under the clear holding of the... With all due respect, it depends on the nature of the error. What I think we're trying to do with you right now, Mr. Shulman, is to assume that the DAV-2000 opinion hasn't been written and that the standard is as applied in the Earth and Lujan for personal injury. So that's the basis on which we're asking you whether Mr. Haisley has made a sufficient showing. And what has come out is that he has an active claim, he hasn't yet decided whether he wants to let the claim go final and try to do a CUE or a supplemental claim. So he's removed from filing a CUE. The next question is, does the regulation bar him from filing a CUE? No, it doesn't bar him from filing a CUE. It would only provide that his CUE would lose if he were going to rely on some new law. So there is no new law that he's pointed to. So that may well be if there's no new law, then the CUE regulation doesn't impact him at all because he's still free to file the CUE. So given those facts, you say, well, how imminent, as opposed to how remote, is the possibility that this CUE regulation harms Mr. Haisley? Your Honor, it's not just our claim about CUE is not just limited to the situation in which there would be an actually sort of reversed interpretation that Mr. Haisley could point to. Indeed, if Mr. Haisley sincerely believes that there's legal error in the original decision, that would be... When you say that, and you say, well, this regulation is somehow impeding his right to bring a CUE based on failure to apply the law, regardless of a change in law, the regulation doesn't bar that. Your Honor, Mr. Haisley is injured because Congress has foreclosed an avenue of redress to which he is entitled by law. It's the same... What's the avenue of redress that's foreclosed? Making a CUE claim that claims the CUE was because the statute's plain meaning was wrongly applied or misinterpreted by the original decision maker. Right. But he hasn't yet come up with a injury that he has today that shows that there is any immediate possibility of that harm being applied to him. Your Honor... I think what Judge Chen was asking was, in essence, to put Mr. Haisley's position into a time frame, right? And your arguments that he would be barred from filing a CUE claim is not correct. He could file the CUE claim and his claim... Well, Your Honor... Sorry, go ahead. Yes, go ahead. So... Your Honor... It's true that he could file a CUE claim knowing that the claim would fail because of the clearly established DAV interpretation, but I still think that's a count as a harm. His claim would only file if he was trying to rely on a change in law. Correct. I mean, there are a lot of CUE claims that succeed not because somebody thought there was a change in law that benefited him, it's because the law that got applied by the RO at the time they did it was applied wrong. Well, Your Honor, again, with all due respect, it seems to me like you're asking me to rebut the government's argument that Gober should essentially be disregarded or abrogated. Well, yes. I mean, that's what a hypothetical is for, usually in our court. And so when I asked the hypothetical, I assumed you would engage on the basis that Gober didn't exist. Correct. Well, that's precisely the question where that's exactly the question that Judge Chen presented to you. Perhaps you didn't hear it. Well, I heard it, Your Honor. I mean, what I've been trying to... Assuming Gober doesn't exist, why does your client have the requisite immediacy as opposed to the non-immolacy of the claim? Well, Your Honor, I believe that in both Lujan and Laidlaw, it was left open that standing an Article III injury could exist based on a sort of reasonable fear that the harm would occur in the future. And I think Mr. Hazley establishes that fear by essentially pointing to the inevitable way that the agency's regulation would operate on his future CUE claim if, as is I think reasonably likely, he believes, as he's attested, that the claim contains error. But, Mr. Shulman, Mr. Shulman, what confuses me is that you came right out of the box admitting you don't even know the details of what his claim is and what his current theory is on what the possible error is. So, I mean, we have no idea whether he's going to, in fact, get relief in this initial claim. And then if he doesn't, we have no idea if he's going to file a CUE claim because of that. And then if he does file a CUE claim, we have no idea what the basis of his theory of clear and unmistakable error would be because, of course, we don't have a finality yet of the initial decision, which would have the alleged error in it. And so we don't know if that CUE claim would ever be premised on the notion that the interpretation that later got reversed by a court. I mean, do you see the contingent events that are all linked up in a long chain that make this feel somewhat tenuous or do you not see that? Well, Your Honor, again, I reiterate that we did not represent and do not represent Mr. Haseley before the board. I would argue that it is not a requirement of standing to show that you are going to win your future claim or even have a. No, I'm trying to figure out whether he even has a theory for how this regulation would ever be applied against him. Well, for example, in Laidlaw, Your Honor, this is at 528 U.S. 184. The court said it saw nothing improbable about the proposition that the pollution a company was engaging in would, quote, cause nearby residents to curtail their recreational use of that waterway and was subject to them to other economic and aesthetic harms. That's also a conjecture, Your Honor. You may consider it a more probable conjecture. I don't necessarily agree. But I think that should establish, and there's nothing in Lujan or Laidlaw that rules this out, that Mr. Haseley's, you know, probabilistic inability to bring a legal error CUE claim once the his decision becomes final is enough to establish injury in fact, and thus Article 3 standing. Let's make sure I understand right now. You're telling me you're because you're not counseled for Mr. Haseley and his benefits claim. You don't you don't have any idea what his theory is for what the VA got wrong with his with their decision. Is that right? That's correct. OK, go ahead and say whatever you want to say next. Well, I was turning to the merits, Your Honor. OK, go ahead. The agency's regulation defies the statutory text, which authorizes, quote, review to determine whether clear and unmistakable error exists in a case, exists present tense. The most natural reading of that present tense clause, clear and unmistakable error exists, is that CUE is measured as of the time of review, not the time of the original ratings office determination. But even if there is ambiguity in Congress's use of exists, the pro-veteran canon means that the ambiguity must be resolved in favor of the veteran. In DAV against Gober, a panel of this court sustained a similar interpretation of CUE that the agency applies to a Board of Veterans Appeals decision. Respectfully, that aspect of Gober. Counselor, answer a background type question for me. Has the-has a veteran's claim status changed from the time that this petition was filed, the one we're reviewing now and today? Has a-has a veteran's claim status changed? Sorry, Your Honor, I'm not- Yes. Mr. Haseley received-Mr. Haseley received his decision in April of this year, which is-which is after the petition was initially filed. Okay. And do we-do we establish standing at the time that the petition was brought or after that? Well, we argued for standing at the time the petition was brought on the basis of Gober. The supplemental standing order did not exist at that point, and I believe the order said that any evidentiary submissions would be considered timely filed. Just as a general principle of law, when is standing determined? At the time of the filing of a petition, or the cause of action, or at a later point? I believe it's typically at the-at the time of the filing of the cause of action, but that it can be cured by later evidentiary submissions. All right. Thank you. Thank you. Your Honor, I'll-I'll get back to my sort of main fork in the road here, which is that though we believe the clear and unmistakable error plainly encompasses the sort of error where a-the agency misinterprets the plain meaning of a statute or regulation, even if this court finds that the statutory term is ambiguous, it still should be resolved in the pro-veteran canon. This court has not definitively settled the relationship between the canon and Chevron deference, but-but we submit that the best way to treat the pro-veteran canon in this circumstance is as a clear statement. What-what-pardon me just for a second. What do you mean the court has not resolved? What-what question is open? Well, the-the question that's open is the pro-veteran-both the pro-veteran canon and the ambiguities in statute, but there is no single clear dispositive answer from this court on whether there's a hierarchy between the pro-veteran canon and Chevron, and if so, what that hierarchy is. We think the best answer, because it reflects- I don't-I don't-I don't understand what you mean. We have-we have clear precedent that says panels are bound to apply the pro-veteran standard at step two of Chevron. I don't agree. I don't agree with that, Your Honor. You haven't read the cases? We have a separate opinion from Judge O'Malley and Procopio, which questions that. Your Honor, there's a series of-I believe we're getting into rebuttal time, but I'll just answer this question as expeditiously as I can right now. We have a variety of cases, including both from the Supreme Court and from the circuit, saying that the canons of construction apply at Chevron step one to resolve ambiguity before any question of deference to the agency kicks in. We also have a line of cases, both from the Supreme Court and from the circuit, Henderson in the Supreme Court, Sersley and Hudgins in the circuit, saying that the pro-veteran canon operates as a clear statement rule. That is, that Congress must unambiguously exclude the non-pro-veteran reading if the non-pro-veteran reading is to be given effect. That must mean that the pro-veteran canon operates at step one to resolve ambiguity before we move to Chevron. I'll reserve the rest of my time for rebuttal, Your Honor. OK. Counselor Bey? Thank you, Your Honor. May it please the Court, I will dive right into standing, as has been the course of the arguments this morning, and I will start with Mr. Hasley's standing as well, which I believe counsel did not. I understand your honors have questioned Mr. Hasley's standing, and I believe that your honors have it exactly right, which is that Mr. Hasley does not have standing because he does not have a claim that's even remotely subject to Q right now. Rather, what he has is a decision that he disagrees with from the VA, and that is still within the period of time, the one-year period of time for him to appeal it to the board or seek other avenues of recourse, other avenues of review or re-adjudication. Therefore, there's simply nothing to tie him to any harm associated with the Q rule. I think, as we said in our brief, there's layers upon layers of speculation here as to another, which would necessarily even involve a decision involving another hypothetical claimant, not just Mr. Hasley. Thereby, I don't think that Mr. Hasley has established personal standing. I'd like to talk also about NVLSP's standing. NVLSP appears to mostly assert that it has third party standing, but it cannot establish pursuant to the factors that have been set forth in Kowalski by the Supreme Court that he meets these two third party standing factors, the close relationship and the hindrance aspect. And I'd like to focus mostly on the hindrance aspect here. NVLSP has not demonstrated that if it has close relationships with any veterans, that they are hindered for protecting their own interests. And I think the main arguments they make, which is that the veteran system overall hinders veterans and that Q might be difficult to understand and it might be hard for them to assert their own rights. I think that's completely been foreclosed by Kowalski, by the Kowalski case already. Kowalski specifically found that indigent defendants who are proceeding pro se are not hindered from bringing their claims just because they do not have counsel. And therefore, the law firm in the Kowalski case did not have third party standing because they could not demonstrate hindrance just through these veterans or these indigent defendants having to proceed pro se. So I think we've established that NVLSP does not have third party standing and Haseley does not have third party standing. Therefore, there is no cause to continue with the merits of the case. Having said that, I will, of course, address the merits. I know we've already... Can you speak a little bit about organizational standing? I mean, NVLSP is an organization after all. They are an organization. They did not actually originally assert organizational standing. Rather, in their opening brief, they talked only about third party standing. And I believe in the court's order, it only asked about third party standing. Having said that, because I believe that NVLSP did address organizational standing in its supplemental brief, I'll touch on that quickly. And the answer is that, like we said in our brief, NVLSP also does not have organizational standing. The Havens has held that, or the Supreme Court's decision in Havens has stated a distinguished injury to an organization's activities from a setback to the organization's abstract social interests. And here, NVLSP has not demonstrated anything specific that shows how the Q rule has inhibited its daily operations. In fact, it has admitted that it is representing appellants that are seeking review. And it also has not demonstrated that there has been a drain on the organization's resources that is directly tied to the Q rule. I think the only specific thing that they point out has to do with, I think, screening cases. But this is insufficient to show a drain on the organization's resources, because as I think Mr. Stichman declared in an attachment to NVLSP's supplemental brief, regardless of whether the Q rule exists or not, every year NVLSP screens thousands of board decisions to see whether to represent a veteran or surviving family member. Accordingly, this is just part of its daily operations. It has not been specifically affected by the Q rule. So unless the court has any other questions on standing, I'll just turn briefly to the merits. And regarding the merits, I'll try not to retread on what we already discussed in the MBA case, because of course the Q rule is an issue in that case as well. And everything that applies to the Q rule there would apply here as well. I'll try to keep my arguments tailored specifically to things that Haisley has raised. And I think the important points there are that Haisley, unlike MBA, specifically calls for the abrogation of DAV. It doesn't appear to mention Jordan, at least not in its opening brief. But Jordan would also necessarily have to be abrogated if DAV were, because DAV and Jordan have specifically upheld the board regulation that is identical to the regulation that we have here. But of course, the court would have to sit on bond in order to overrule DAV. And there's simply no cause for doing so, nor has counsel mentioned any additional cause today for doing so. So I'll then just turn to counsel's focus on the word exists. I think we did a good job in our brief about establishing why this word does not hold the import that Haisley seems to think that it does. And I'll just quote that exact phrase from the statute that this word is used in. That's subsection C, where it states, review to determine whether clear and unmistakable error exists in a case may be instituted by the secretary on the secretary's own motion or upon request of the claimant. So the nature of the word exist here is completely divorced from whether the judicial interpretation will be the one existing at the time of the Q assertion or at the time of the initial decision in which Q is being alleged. Rather, we're just saying here that certain parties may initiate review to determine whether a clear and unmistakable error exists. And that's to say that regardless of whether this alleged error is based on the record evidence, so based on a factual issue, or based on the application of law, or even based on the interpretation, which of course we don't think constitutes Q, the error would still exist in the present day. And that's all that exist means here. It has nothing to do with whether the changes in interpretation should be applied retroactively to final decisions, which it very much should not be. Finally, I would submit in response to counsel's argument regarding the veterans canon, first that Your Honor is correct that the veterans canon does not come into play during Chevron step one. But I think more importantly, this court doesn't even need to reach the issue of how the veterans canon is construed with regard to Chevron deference. And that's because, again, here we have binding precedent, which governs this case. And we have clear congressional intent that the board regulation and the AOJ regulation were meant to be considered together. And that there is congressional intent to specifically incorporate 3.105 and the veterans court understanding from Russell and Berger, which states that the law should be assessed as was the law at the time of the initial decision. So unless the court has any further questions, we respectfully request that this court either dismiss the petition for lack of standing or deny it. Thank you. Ms. Bey, any chance in the past three hours you came to learn what a Department of Veterans Affair issue is? I'm afraid I have not. I was busy listening to the other arguments and preparing a little bit additional to this one. I'm sorry about that. Okay. Okay, Mr. Shulman, you have three minutes of rebuttal. Thank you, Your Honors. Three points or first main point is on NVLSP's organizational standing. Under the PETA case of the DC Circuit, we believe it's clear that NVLSP has organizational standing to protest this, you know, protest is the wrong word, to seek relief against this blocked avenue of redress just as the environmental and animal rights organization PETA had standing in that case because the agency action that actually was inaction that was challenged was a general affront to its mission to protect birds. I don't believe there's any cognizable difference in the two situations that would add up to a clear decision that NVLSP does not suffer organizational harm and thus have organizational standing. My second point goes to the government's statements about plain meaning and as a tertiary issue, Chevron. If you go back to Russell v. Principi, which the government has always claimed and which the original DAV v. CUE that was, in effect, codified into the first CUE law, it shows that there's simply no reading in which it can be said that the CUE rule, that it's a reasonable interpretation of the CUE rule or that it's an interpretation of the plain meaning of the CUE rule that, quote, that it ruled out reinterpretations of the statute based on the statute's plain meaning. Russell said... Mr. Shulman, the 1996 version of 3.105, if I could... This is the pre-congressional codification version. Let me just read the first line. It says, the provisions of this section, that is to say CUE, the provisions of CUE apply except where there's a change in law or a Department of Veterans Affairs issue or a change in interpretation of law or a Department of Veterans Affairs issue. So that has always been part of this regulation, even before Congress adopted CUE and, as I understand it, adopted this very regulation. And this regulation says you may not have CUE if it's based on a change in interpretation of law. So what am I missing here in terms of what Congress codified in terms of, apparently, it codified the preclusion of relying on CUE for a change in interpretation of law? Your Honor, a later interpretation of the law based on the law's plain meaning is not that sort of a change in interpretation of the law. And I think this is clear if you look at Russell. And Congress's codification, to whatever extent it existed, has to be understood, not just as the pre-statutory regulation. Just so I understand, you want me to read the pre-codification regulation to say the provisions of this section shall apply except where there's a change in interpretation of law that not has anything to do with the plain meaning? Change in interpretation of law, we would say, refers to an agency's delegated right to fill gaps, make interstitial rules, and interpret genuinely ambiguous terms in statutes. Why doesn't that also apply to judicial interpretation? Sorry? I'm just saying it says change in interpretation of law, which now you want me to read as a change in agency interpretation of law. And I'm just wondering, why do I get to carve down the otherwise plain reading of this regulation provision? Because, Your Honor, when a court later declares, as in Procopio, what a law always meant, it's doing something more than changing the interpretation of the law. It's declaring what the law always meant. And again, I'll go to Russell, which gives an understanding of CUE that the agency itself later incorporated into its later regulation. Either the correct facts, as they were known at the time, were not before the adjudicator, or the statutory or regulatory provisions at the time were incorrectly applied. When a court, like in the situation of Procopio, goes back and says, no, this is what this term always meant, it's plain, that is an instance of something being incorrectly applied, and thus CUE, by the understanding of Russell, and indeed by the agency's own understanding, until it passed this new regulation, essentially trying to rule that out. But that's all subject to the rule of finality in Chico County, like the Supreme Court, right? Sorry, Your Honor, the rule of finality? It's been recognized, as they used to say in law school from time immemorial, that when a court interprets a law on day one, that interpretation can assume the law was enacted on day one, and a court interprets the law five years later, then it's always been the law that that interpretation, five years later, says what the meaning of the law was the day that it was enacted. That's black-letter law. I mean, you would fail law school if you didn't understand that. There's another body of law called the law of finality, and the law of finality says the rule of retroactivity applies in some cases, but not in others. And those cases say that this interpretation that happened in year five goes back and has retroactive effect to open cases, but it does have an effect to close cases. That's the clear law of, it's the Supreme Court law, it's a bedrock. And so Q, by definition, is a collateral attack on a closed judgment. Your Honor, the answer is that simply by... Any Q rule that allowed a later interpretation of law to govern the decision in the Q would be contrary to bedrock Supreme Court law. But, Your Honor, the difference is that Congress has specifically passed a CUE statute that allows for the retroactive award of benefits going back to the date they were awarded. The Congress ordinarily legislates against the backdrop of bedrock Supreme Court law. But Congress understood that this is the giving out of benefits in an Article I agency. Can you point to anything in the legislative history of the Q, of the law that's allowing for Q at the BVA, at the RO, that expressly says Chico County does not apply? I cannot point to anything that expressly says that, but again, I would point to the language in Russell that Congress said it was adopting, that CUE is when the statutory or regulatory provisions extent at the time were incorrectly applied. If that means anything, it means that a later declaration that this is what the law always meant. It only means that if you use the doctrine that says what the law was later always was, and that it applies retroactively. Yes, but the entire CUE structure is based on awarding retroactive benefits. It's an exception to res judicata principles, Your Honor. It's governed on different principles than the background principles governing the Article III course. It's a specific statute passed to award retroactive benefits based on errors in cases that have become final. Right. Well, it's like other, it's like Rule 60B-6 and other things that allow for retroactivity, but it's barred, it doesn't apply to closed cases. I'm not sure what you mean that it doesn't apply to closed cases, Your Honor. CUE authorizes a tact on final decisions. I appreciate that. I believe I've used the bulk of my time, so I will yield. Thank you, Your Honors. Are we here? I'm sorry, were there any further questions? Okay, I'm sorry. I was on mute. I was on mute and I was talking. Yes, there's no further questions. We thank all the parties for their arguments. The cases are now taken under submission and this court now goes into recess. The Honorable Court is adjourned until tomorrow morning at 10 a.m.